## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | **Civil Action No. 18-cv-7128** |
| | : | |
| **CHRISTOPHER COLLINS,** | : | |
| **CAMERON COLLINS, and** | : | **Jury Trial Demanded** |
| **STEPHEN ZARSKY,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

_____ :

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Christopher Collins, Cameron Collins, and Stephen Zarsky, alleges as follows:

### SUMMARY

1.      This action involves illegal insider trading by Defendants Christopher Collins, Cameron Collins, Stephen Zarsky and others.

2.      On Thursday, June 22, 2017, Christopher Collins, then a member of the board of directors of Innate Immunotherapeutics, Ltd. ("Innate") and a U.S. Congressman representing the 27th Congressional District of New York, learned material, nonpublic information about clinical trial results for a drug being developed by Innate.  That evening, Innate's CEO emailed Christopher Collins and other members of Innate's board to report "extremely bad news" that the trial results "pretty clearly indicate[d] 'clinical failure.'"

1

3.      Christopher Collins responded to the email and then approximately 15 seconds later began attempting to reach his son, Cameron Collins.  After exchanging several missed calls, Christopher Collins and Cameron Collins connected and spoke for six minutes.  Over the next two trading days, between the opening of the market on Friday, June 23, and the close of the market on Monday, June 26, and while the clinical trial results were still nonpublic, Cameron Collins sold a total of nearly 1.4 million Innate shares based on material, nonpublic information he received from Christopher Collins.  Cameron and Christopher Collins spoke by telephone at least nine times during that same time period.

4.      Cameron Collins further conveyed material, nonpublic information he received from Christopher Collins, as shown below:



5.      Cameron Collins was with his girlfriend at the home they shared when he and his father spoke on the evening of June 22.  Shortly after the call ended, Cameron Collins and his girlfriend drove to her parents' home.  Within minutes of their arrival, his girlfriend's mother took steps to sell her Innate shares.

6.      Before the markets opened the following morning, Cameron Collins, back at his and his girlfriend's home, placed his first order to sell Innate shares.  Shortly thereafter, his girlfriend called and spoke to her father, Stephen Zarsky.  Less than five minutes later, Stephen Zarsky placed an order to sell all of his Innate shares.

7.      Cameron Collins then drove back to the Zarsky home, where he placed another order to sell Innate shares.

8.      While Cameron Collins was at Stephen Zarsky's home that Friday morning, Stephen Zarsky called his brother, who had previously purchased Innate shares at Stephen Zarsky's urging, and tipped him to sell his Innate shares.  Less than three minutes later, Stephen Zarsky's brother placed an order to sell all of his shares.

9.      That same morning, Stephen Zarsky also tipped a friend who had purchased Innate shares at his encouragement.  Within three minutes, that friend placed orders to sell all of his Innate shares.

10.     Finally, on the morning of Monday, June 26, Cameron Collins tipped a friend who had previously bought Innate shares on his recommendation.  Five minutes later, Cameron Collins's friend placed an order to sell all of his Innate shares.

11.     On the evening of Monday, June 26, 2017, Innate announced the negative results of the drug trial to the public.  On the next trading day, Innate's share price plummeted over 90% to $0.0351 from the previous day's close of $0.45.

12.     During the almost four days between the time Christopher Collins learned about the negative drug trial results and when they were announced publicly, his son Cameron Collins, Cameron Collins's girlfriend, her mother, and her father, Stephen Zarsky, collectively sold over 1.78 million Innate shares.  In addition, Cameron Collins's friend, Stephen Zarsky's brother, and

Stephen Zarsky's friend collectively sold more than 25,000 additional Innate shares.

13.     By selling their Innate shares before the negative drug trial results were announced, Cameron Collins, Stephen Zarsky, and their tippees avoided total losses of approximately $768,600.

14.     By engaging in the conduct alleged in this Complaint, Christopher Collins, Cameron Collins, and Stephen Zarsky violated, and unless restrained and enjoined will violate again, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder and Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") [*15 U.S.C.  § 77q(a)(1)*].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

15.     The Commission brings this action against Christopher Collins, Cameron Collins, and Stephen Zarsky pursuant to Section 21A of the Exchange Act [*15 U.S.C. § 78u-l*] and Section 20(b) of the Securities Act [*15 U.S.C. § 77t(b)*] to enjoin the transactions, acts, practices, and courses of business alleged in this Complaint and to seek orders of disgorgement, along with prejudgment interest, civil penalties, officer and director and penny stock bars against Christopher Collins, and such further relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*] and Sections 20(b) and 22(a)  of the Securities Act [*15 U.S.C. §§ 77t(b) and 77v(a)*].

17.     Venue in this district is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*] and Section 22(a) of the Securities Act [*15U.S.C. § 77v(a)*].  Certain of the sales of securities and acts, practices, transactions, and courses of business constituting the violations

alleged in this Complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges.  Specifically, many of the securities trades alleged as part of the violations in this Complaint were handled and executed by trading personnel located in this District.

### DEFENDANTS

18.     **Defendant Christopher Collins**, age 68, is a resident of Clarence, New York.  In 2012, Christopher Collins was elected to serve the 27th Congressional District of the State of New York in the U.S. Congress and is currently in his third term.  At the time of the relevant conduct, Christopher Collins was a member of Innate's board of directors and the company's largest shareholder.

19.     **Defendant Cameron Collins**, age 25, is a resident of Asbury Park, New Jersey. Cameron Collins is the son of Christopher Collins.  Cameron Collins sold over 1.3 million shares of Innate on June 23 and 26, 2017, before the company announced negative drug trial results, and avoided losses of approximately $570,900.

20.     **Defendant Stephen Zarsky**, age 66, is a resident of Summit, New Jersey. Stephen Zarsky is the father of Cameron Collins's girlfriend (now fiancée).  Stephen Zarsky sold all of his 303,005 shares of Innate on June 23, 2017, avoiding losses of approximately $143,900.

### RELEVANT ENTITY

21.     **Innate Immunotherapeutics, Ltd. ("Innate")** is a biotechnology company headquartered in Sydney, Australia that developed a drug, MIS416, intended to treat multiple sclerosis.  At the time of the relevant trading, the company's securities publicly traded in the

United States as a penny stock on the OTC Pink market under the ticker symbol INNMF and also traded on the Australian Stock Exchange (the "ASX").

## FACTS

**Christopher Collins Had a Duty Not to Disclose Innate's Material, Nonpublic Information**

22.     At all relevant times, Christopher Collins was a member of Innate's board of directors.  He and two of his children were also large shareholders of Innate.  As of June 22, 2017, his son Cameron Collins owned over 5.2 million shares of Innate, most of which Christopher Collins had purchased for him.

23.     As a member of Innate's board of directors, Christopher Collins owed a duty to Innate's shareholders to safeguard material, nonpublic information that belonged to the company.  Innate's Securities Trading Policy prohibited directors and other company insiders from trading in the company's securities if the person knowingly possessed material information about the company that was not generally available to the public.  Likewise, the policy also prohibited a person with inside information from directly or indirectly communicating that information to another person if the insider "knows, or ought reasonably to know," that the other person would be likely to trade on it.

24.     Prior to the relevant trading, Innate began developing MIS416.  In 2014, a clinical trial to test the efficacy of the drug began.

25.     In April 2017, Innate announced publicly that the last patient had completed the clinical portion of the study and that the final results would be available in August or September of 2017.  Innate further noted that it might receive and release publicly the high-level, preliminary conclusions of the trial, referred to as the "top-line" results, sooner.

26.     In early June 2017, Innate informed its board of directors that they would not be

permitted to trade Innate securities between June 5 and July 11, 2017, because results of the clinical trial would be released imminently.  This blackout period was later modified to allow board members and other insiders to trade 24 hours after the trial results were announced publicly.

27.     On June 9, 2017, Innate's CEO emailed Christopher Collins and other members of the board of directors that the top-line data had been delivered to Innate's consultants and that "the delivery date for their review and 'verdict'" would be the close of business on June 22, 2017, in the United States.

28.      Innate had made consistently positive public statements about the potential efficacy of MIS416 before and during the clinical trial, and in the weeks leading up to the release of the results of the clinical trial, Defendants and their tippees believed the results would be positive.

29.     On June 5, 2017, less than three weeks before he would learn the results of the clinical trial, Christopher Collins discussed the possibility that, if the company received a strong "efficacy signal" from the trial, MIS416 could be a candidate for accelerated approval by the U.S. Food and Drug Administration ("FDA") and added that "it's our thinking based on [another] trial and anecdotal evidence that it will be [accelerated for approval]. . . ."

30.     On June 20, 2017, Innate announced that the FDA had cleared Innate's Investigational New Drug application, which would allow the company to meet with the FDA following the release of the data from the clinical trial to discuss further testing of the drug. Innate described the FDA's action as "a further milestone in the ongoing clinical development of MIS416."

31.     Consistent with a belief that the results of the MIS416 clinical trial would be

positive and thus that shares of Innate would become more valuable, Cameron Collins added to his investment position of more than 5 million Innate shares in the days leading up to the release of the results.  On June 15, 2017, Cameron Collins opened a new brokerage account and used funds from his 401(k) account to purchase 16,508 additional shares.

32.     Likewise, five days later, Cameron Collins's girlfriend invested in Innate for the first time on June 20, 2017, buying 40,464 shares in a brokerage account that she had opened the previous day.

33.     The year before, Cameron Collins's girlfriend's parents also invested in Innate after she told her mother by text message in August 2016, "I think we all need to consider investing in innate therapeutics.  I might put in $15k and that has a greater than 50% chance of going up to $250k.......that is actually unheard of and cams dad almost guarantees it within the next 1 to 2 years. . . ."  The next day she added, "And we'll always keep in touch with cams dad who I'm guessing would know how things are looking as we get closer to the end of the trial."  A few days later, she told her mother, "I'll make sure cams dad keeps us in the loop."

34.     On September 9, 2016, Cameron Collins's girlfriend's father, Stephen Zarsky, purchased 200,000 shares of Innate.  Her mother purchased 50,000 shares the next business day. Stephen Zarsky made additional subsequent purchases.  He and his wife purchased a total of 353,005 shares of Innate prior to the relevant trading.

**Christopher Collins Learned Material, Nonpublic Information About the Negative Results and Immediately Set Off a Tipping Chain**

35.     On the evening of June 22, 2017, as they were expecting, Christopher Collins and other members of Innate's board of directors were told the top-line results of the clinical trial of MIS416.  The outcome of the trial, however, was unexpectedly negative.  At approximately 6:55 PM ET, Innate's CEO emailed the board of directors, stating that he had "extremely bad news to

report" and that the results "pretty clearly indicate 'clinical failure.'"  He also reported that the consultants "cut and diced the data multiple times/ways to see if there were some meaningful positives, [but] could not find any."  This information was material and nonpublic.

36.     Christopher Collins received the CEO's email while attending an official event on the South Lawn of the White House.  At approximately 7:10 PM ET, while still at the event, Christopher Collins responded to the email, "Wow.  Makes no sense.  How are these results even possible???"

37.     Within about fifteen seconds of sending his email response, Christopher Collins began trying to contact his son, Cameron Collins.  He called two times back-to-back at 7:11 PM ET, but did not reach him.  Between 7:14 and 7:16 PM ET, Cameron Collins and Christopher Collins tried unsuccessfully three more times to reach one another.  They ultimately spoke by telephone for six minutes beginning at 7:16 PM ET.

38.     At the time of the phone call with his father, Cameron Collins was with his girlfriend at the home they shared.  Approximately fifteen minutes after this call ended, his girlfriend logged into the brokerage account in which she held the Innate shares she had bought two days before.

39.     Approximately 90 minutes after Cameron Collins spoke to Christopher Collins, Cameron Collins and his girlfriend left their home and drove to the home of her parents.  They arrived at approximately 9:17 PM ET.

40.     Approximately five minutes after arriving at his girlfriend's parents' house, Cameron Collins logged into his brokerage account.  A few minutes later, at approximately 9:28 PM ET, his girlfriend's mother logged into her brokerage account and unsuccessfully attempted to place an order to sell all of her Innate shares.

41.     At 9:34 PM ET, Cameron Collins's girlfriend's mother called the brokerage firm, and representatives guided her through the process of selling her shares on the ASX.  At 9:58 PM ET, while still on the phone with a brokerage firm representative, she placed an online order to sell all of her 50,000 shares of Innate.  30,250 of her shares sold on the ASX between 9:58 and 10:04 PM ET.

42.     At 10:26 PM ET on June 22, Innate requested that the ASX halt trading in Innate's securities because it had received the results of the MIS416 clinical trial.  The ASX granted the trading halt, which Bloomberg announced at 10:53 PM ET.

43.     Pursuant to ASX rules, a company should consider requesting a halt in the trading of its securities on the ASX whenever the "entity has become aware of information that a reasonable person would expect to have a material effect on the price or value of its securities but is not in a position to make an announcement about the information to the market promptly and without delay."  Thus, under ASX rules, a request for issuance of a trading halt does not indicate whether the material information the company possesses is positive or negative.

44.     The ASX trading halt did not halt trading of Innate's securities on the OTC Pink market in the United States.  As Christopher Collins explained on June 5, 2017, "a market popped up maybe a year ago, pink sheet NASDAQ, so that's just the wild west of brokers in the U.S. buying it on the Australian exchange . . . . Innate has nothing to do with that.  The Australian market has nothing to do with that."

45.     After the trading halt was publicly announced on the night of June 22, Christopher Collins and Cameron Collins spoke again for approximately one and a half minutes beginning at 11:57 PM ET.  At the time of that call, Cameron Collins and his girlfriend were together at their home.  Shortly after that call ended, at 12:01 AM ET, Cameron Collins's girlfriend called her

father, Stephen Zarsky, and they spoke for five minutes.

46.     The following day, June 23, 2017, Cameron Collins, his girlfriend, and Stephen Zarsky quickly took steps to begin selling their Innate shares.  At 7:42 AM ET, before the market opened, Cameron Collins entered an order to sell on the OTC Pink market all of the 16,508 Innate shares he had purchased just eight days before.

47.     Just seconds after Cameron Collins entered that order, his girlfriend called Stephen Zarsky, and the two spoke for about four and a half minutes.  Within five minutes of finishing the call with his daughter, at 7:52 AM ET, Stephen Zarsky entered an order to sell all of his 303,005 Innate shares.

48.     Then, just hours after seeing him the night before, Cameron Collins again drove to the home of his girlfriend's father, Stephen Zarsky.  At 9:28 AM ET, Cameron Collins logged into his brokerage account from the Zarsky house.  At 9:29 AM ET, Stephen Zarsky logged into his brokerage account.  Within a few seconds after the OTC Pink market opened at 9:30 AM ET, the sell orders that Cameron Collins and Stephen Zarsky entered prior to market open were successfully executed.

49.     Shortly thereafter, at 9:37 AM ET, an order was placed in the account of Cameron Collins's girlfriend to sell all 40,464 of her Innate shares.  These were shares that she had purchased just three days before using a brokerage account that she had just opened in order to make the purchase.  The order successfully executed within a minute.

50.     Stephen Zarsky's wife's order from the prior evening to sell all her Innate shares, alleged in paragraph 41 above, did not fully execute before the ASX trading halt went into effect. After discovering this, she called her brokerage firm and placed an order to sell her remaining shares on the OTC Pink market.

51.     Minutes after selling all of his Innate shares, Stephen Zarsky began calling friends and relatives he had previously encouraged to invest in Innate to tell them to sell the stock.  At 9:40 AM ET, Stephen Zarsky spoke to his brother and told him to sell his Innate stock.  Less than three minutes after finishing the call with Stephen Zarsky, his brother placed an order to sell all 9,000 of the Innate shares he owned, which was successfully executed within seconds.

52.     Stephen Zarsky next called his sister, whom he had also encouraged to purchase shares of Innate.  Stephen Zarsky spoke to his sister at 9:42 AM ET and told her to sell the Innate shares that she and her husband had purchased and instructed her not to ask him why.  They attempted to sell their shares shortly thereafter but were unable to do so.

53.     Days later, after the news was made public, Stephen Zarsky texted his brother, "[Sister] and [Sister's husband] never got out even though I told them right after I spoke with you . . . ."

54.     At 10:01 AM ET, Stephen Zarsky also called his friend, who was an Innate shareholder, told him that the drug trial results were bad, and advised him to sell.  Less than three minutes later, Stephen Zarsky's friend began selling his Innate shares and by 10:07 AM ET had sold all 14,800 shares that he owned.

55.     Unlike the other tippees, because of his large position in Innate, Cameron Collins could not sell all of his Innate shares at once without potentially causing a negative impact on the share price.  Throughout Friday, June 23 and Monday, June 26, 2017, the two trading days before Innate publicly announced the bad results of the MIS416 clinical trial, Cameron Collins entered at least 58 orders to sell blocks of Innate shares he owned.  His trading pattern is consistent with an effort to sell shares quickly while minimizing impact on the share price.

56.     Cameron Collins placed and modified many of his sell orders shortly after

telephone calls with Christopher Collins.  In one instance, he placed an order while he was speaking to Christopher Collins on the telephone.

57.     At 9:42 AM ET, on June 23, just minutes after he successfully sold the 16,508 Innate shares he had recently purchased, Cameron Collins called Christopher Collins.  The two spoke for over eight minutes while Cameron Collins was still at Stephen Zarsky's house.

58.     Within four minutes of finishing the call with his father, Cameron Collins entered an order to sell another 100,000 shares of Innate.  That order was successfully executed about a minute later.

59.     About two minutes later, at 9:57 AM ET, Cameron Collins entered a limit order to sell another 100,000 shares at a price of $0.51 cents a share or higher.  There was not immediately a willing buyer at that price.  At 10:42 AM ET, Cameron Collins placed a new order to sell 100,000 shares at any price.  That order successfully executed about five minutes later.

60.     At 10:49 AM ET, Cameron Collins, now back at home, canceled the limit order he had placed at 9:57 AM ET and, at the same time, placed a new limit order to sell 100,000 shares at a lower price.  That order did not execute immediately at the new price.  While that order was outstanding, Cameron Collins spoke to Christopher Collins for almost seven minutes beginning at 11:32 AM ET.  Approximately two minutes after that call ended, at 11:41 AM ET, Cameron Collins placed a new order to sell 50,000 shares at any price.  That order executed successfully within three minutes.  Cameron Collins then placed a limit order to sell 50,000 shares at a lower price than his 10:49 AM ET limit order and canceled that order.  His new limit order successfully executed in approximately one minute.

61.     Cameron Collins continued to enter, cancel, and re-enter orders to sell Innate

shares between 12:55 and 3:02 PM ET.  This pattern of orders and cancellations appears to have

been an attempt to sell shares quickly while monitoring the market and working to minimize the

potential negative effect on the share price from those sales.

62.     At 3:12 PM ET, Cameron Collins again spoke to his father, this time for a little

over five minutes.  While on the phone with Christopher Collins, at 3:15 PM ET, Cameron

Collins entered a limit order to sell 50,000 Innate shares at a price of $0.45 per share or higher.

The order began to execute while Cameron Collins was still on the phone with Christopher

Collins, and the sale was completed within three minutes.

63.     Between 3:19 and 3:58 PM ET, Cameron Collins entered eight more orders to sell

a total of 244,000 Innate shares, all of which were successfully sold prior to the close of the OTC

Pink market at 4:00 PM ET.  Cameron Collins then spoke to Christopher Collins for seven

minutes, beginning at 4:48 PM ET.

64.     Over the course of Friday, June 23, 2017, Cameron Collins, his girlfriend, his

girlfriend's mother, Stephen Zarsky, Stephen Zarsky's brother, and Stephen Zarsky's friend sold

over 1 million shares of Innate.  All of these traders except Cameron Collins sold 100% of their

Innate shares that day.

65.     The sales by Cameron Collins, his girlfriend, and her parents, including Stephen

Zarsky, made up more than 53% of the stock's trading volume that day and exceeded Innate's

15-day average trading volume by more than 1,454%.  Innate shares closed at $0.54 per share on

June 23, an increase of $0.02 over the prior day's close.

66.     On the next trading day, Monday, June 26, 2017, Cameron Collins continued to

sell Innate shares.  Between 9:08 AM and 4:00 PM ET, he placed 36 sell orders, 30 of which

successfully executed for a total sale of 775,000 shares.  Cameron Collins and his father were in

contact that day, speaking twice during trading hours and twice shortly thereafter.  His sales accounted for 55% of Innate's trading volume on that day.  Innate's share price closed at $0.45 per share, down only nine cents from the previous trading day's close.

67.     Between the time that Cameron Collins first spoke to Christopher Collins after he received the email stating that MIS416 had failed its clinical trial and the time that Innate announced the results publicly, Cameron Collins sold over 1.39 million shares of Innate.  During that same four-day period, Cameron Collins and Christopher Collins spoke by telephone at least 13 times.

68.     On June 26, 2017, Cameron Collins also contacted his friend, who had purchased shares of Innate in February 2017 after being encouraged to do so by Cameron Collins.  After exchanging texts and missed calls, the two spoke for slightly less than a minute beginning at 9:14 AM ET.  During that call, Cameron Collins tipped his friend that the clinical trial results were negative and that he should sell his Innate shares.  About five minutes later, Cameron Collins's friend placed an order to sell all of his shares.

69.     At 7:11 PM ET, on June 26, 2017, Innate first publicly announced the negative results of the MIS416 clinical trial, and the ASX trading halt was then lifted.  This information was highly material, and the following trading day, investors reacted to it.  Innate's share price dropped 92% that day to $0.0351 from the previous day's close of $0.45.

70.     By selling Innate shares based on material, nonpublic information, Cameron Collins avoided losses of approximately $570,900, and Stephen Zarsky avoided losses of approximately $143,900.  Their tippees avoided additional losses of approximately $53,800.

**Christopher Collins Tipped His Son With the Expectation He Would Trade**

71.     When Christopher Collins tipped Cameron Collins, Christopher Collins

anticipated that Cameron Collins would trade.  At the time that he shared the information with Cameron Collins, Christopher Collins knew that Cameron Collins owned approximately 2% or approximately 5.2 million of Innate's outstanding shares.

72.     In fact, in the weeks leading up to the release of the results of the MIS416 clinical trial, Christopher Collins took steps to ensure that Cameron Collins's Innate shares would be readily tradeable.  At the time, Christopher Collins, his daughter, and Cameron Collins each owned Innate shares that were held by an Australian transfer agent and that could not be sold in the U.S. market.

73.     On May 15, 2017, Christopher Collins spoke to a representative at a U.S. brokerage firm about transferring Innate shares he, his daughter, and Cameron Collins owned to accounts at the brokerage firm.  The brokerage firm representative advised Christopher Collins that each of the three shareholders would have to open an account at the firm and then complete forms to transfer their shares from Australia.

74.     On May 16, 2017, Christopher Collins and Cameron Collins each opened accounts at the U.S. brokerage firm.  An account in the name of Christopher Collins's daughter was opened on May 21, 2017.

75.     On or about May 22, 2017, Christopher Collins executed forms to transfer his Innate shares from the Australian transfer agent to the U.S. brokerage firm and caused similar forms to be executed to transfer the shares of his daughter and Cameron Collins to their newly opened U.S. brokerage accounts.  On May 24, 2017, Collins sent an email stating, "I have the 3 accounts set up and just sent the transfer paperwork to [U.S. brokerage firm].  So I think all is set.  Expect it will take 4 weeks."  The transfer of Cameron Collins's 5.2 million Innate shares to his U.S. brokerage account was successfully completed on June 9, 2017.

76.     Christopher Collins and his daughter, however, were not able to transfer their shares from the Australian transfer agent to the U.S. brokerage firm prior to the public announcement of the results of the MIS416 clinical trial.  The U.S. brokerage firm informed each of them that the transfers of their shares had been rejected because of problems with their transfer forms.  Thus, at the time that Christopher Collins learned the results of the MIS416 clinical trial on June 22, neither he nor his daughter was able to sell Innate shares in the U.S.

77.     On June 22, Christopher Collins knew, however, that Cameron Collins's 5.2 million Innate shares had been successfully transferred to a U.S. brokerage account and could be sold.  And after Christopher Collins learned of the negative results, his first phone call was to Cameron Collins.

**Subsequent Public Statements Obscured the Timing of Cameron Collins's Sales of Innate Shares**

78.     In the months leading up to the relevant trading, a local newspaper covering a portion of Christopher Collins's legislative district published articles discussing Christopher Collins's involvement with Innate.  For example, on May 16, 2017, the newspaper published an article stating, "Congressional ethics investigators are probing Rep. Chris Collins' role in attracting investors to [Innate]."

79.     After Innate publicly announced the clinical failure of MIS416 on the evening of June 26, 2017, a reporter working for the newspaper contacted a member of Christopher Collins's staff.  About ten minutes later, at 7:24 PM ET, Christopher Collins called Cameron Collins, and the two spoke for almost three minutes.

80.     Cameron Collins then immediately logged into his brokerage account, called his brokerage firm, and had his U.S. brokerage account enabled to sell shares of Innate in the Australian market, which was about to resume trading of Innate shares following the company's

announcement of the negative trial results.

81.    At approximately 8:25 PM ET, after the Australian market had opened, Cameron Collins called his father, and they spoke for a little more than two minutes.

82.    Immediately after the call with his father ended, Cameron Collins placed an order to sell 500,000 shares of Innate on the ASX with a limit price of AUD .03 or higher.  This large order fully executed in approximately two minutes.  By approximately 8:51 PM ET, in a span of 24 minutes, Cameron Collins had sold all of his remaining 3,825,000 shares of Innate.

83.    On June 29, 2017, the local newspaper published an article entitled, "Collins' office says family, chief of staff held onto stock as it sank."  The article contained a statement issued by Christopher Collins's office worded to dispel any suspicion of insider trading by the Collins family: "Neither Chris Collins [nor his daughter] . . . have sold shares prior, during, or after Innate's recent stock halt . . . Cameron Collins has liquidated all of his shares after the stock halt was lifted, suffering a substantial financial loss."

84.    The statement by Christopher Collins's office omitted the fact that Cameron Collins sold almost 1.4 million Innate shares on the OTC Pink market during Innate's ASX trading halt, prior to the public announcement of the bad drug trial results, avoiding losses of approximately $570,900.  Similarly, it did not disclose that Christopher Collins and his daughter could not sell their Innate shares at that time because their efforts to transfer them to a U.S. brokerage account prior to the announcement of the results of the MIS416 clinical trial had failed.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

85.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 84, inclusive, as if fully set forth herein.

86.     At all relevant times, Innate's policies required that company insiders maintain the confidentiality of the company's material, nonpublic information and prohibited them from using such information to trade for their own accounts or disclosing this information to others.

87.     Christopher Collins, a member of Innate's board of directors, tipped his son Cameron Collins with material, nonpublic information about Innate's negative drug trial results in violation of Innate's policies and in breach of the fiduciary duty that he owed to the company. Christopher Collins knew or recklessly disregarded that he breached his duty by disclosing this inside information to Cameron Collins.

88.     Christopher Collins received a personal benefit from his tip of material, nonpublic information to his son Cameron Collins, including the benefit of providing a gift of information to a close relative.  Christopher Collins also knew or recklessly disregarded that Cameron Collins would trade on his tip.

89.     Cameron Collins and Stephen Zarsky sold Innate securities and tipped others to sell based on inside information that Cameron Collins received from Christopher Collins. Stephen Zarsky and Cameron Collins received a personal benefit from their tips of material, nonpublic information to their family and/or friends, including the benefit of providing a gift of information to a close relative or friend.  Stephen Zarsky and Cameron Collins knew or were reckless in not knowing that this infomation was material and nonpublic.  Cameron Collins and Stephen Zarsky knew or recklessly disregarded that their tippees would trade on their tips.

90.     Cameron Collins and Stephen Zarsky knew, were reckless in not knowing, should have known, or consciously avoided knowing that the tips they received were conveyed in breach of a fiduciary duty or a similar obligation arising from a relationship of trust and confidence in exchange for a benefit.

91.     Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

By reason of the actions alleged herein, Defendants violated  Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R.§ 240.10b-5*] and unless restrained and enjoined will continue to do so.

## <u>SECOND CLAIM FOR RELIEF</u>

### Violations of Section 17(a)(1)

92.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 90, inclusive, as if fully set forth herein.

93.     Defendants, by use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities, directly or indirectly, with scienter, employed devices, schemes, or artifices to defraud.

94.     By reason of the actions alleged herein, Defendants violated  Section 17(a)(1) of the Securities Act [*15 U.S.C. § 77q(a)(1)*] and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter Final Judgments:

### I.

Finding that Defendants violated the provisions of the federal securities laws as alleged herein;

### II.

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and Section 17(a)(1) of the Securities Act [*15 U.S.C. § 77q(a)(1)*];

### III.

Ordering Defendants to disgorge, with prejudgment interest, all illicit trading profits, avoided losses, or other ill-gotten gains received by any person or entity as a result of the actions alleged herein;

### IV.

Ordering Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [*15 U.S.C. § 78u-1*];

### V.

Ordering that Defendant Christopher Collins be permanently barred from participating in an offering of any penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock;

## VI.

Ordering that Defendant Christopher Collins be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [*15 U.S.C. § 78o(d)*]; and

## VII.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated: August 8, 2018                                  Respectfully submitted,


 S/ Robert A. Cohen
Robert A. Cohen
Joseph G. Sansone
Cheryl L. Crumpton*
Melissa J. Armstrong*
William Max Hathaway*
Colby A. Steele*
Carolyn M. Welshhans*

*Application for admission *pro hac vice* forthcoming

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel:  (202) 551-4459 (Crumpton)
Tel:  (202) 551-4724 (Armstrong)
crumptonc@sec.gov
armstrongme@sec.gov